[Cite as *State ex rel. Siedle v. State Teachers Retirement Sys.*, 2025-Ohio-1626.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Edward Siedle,     :

     Relator,     :

                                   No. 22AP-375

v.     :

                            (REGULAR CALENDAR)

State Teachers Retirement System of Ohio,     :

     Respondent.     :

D E C I S I O N

Rendered on May 6, 2025

**On brief:** *Advocate Attorneys, LLP, Andrew M. Engel*, and *Marc E. Dann*, for relator. **Argued:** *Andrew M. Engel.*

**On brief:** *Isaac Wiles & Burkholder LLC, Donald C. Brey*, and *Ryan C. Spitzer*, for respondent. **Argued:** *Ryan C. Spitzer.*

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

JAMISON, P.J.

{¶ 1} Relator, Edward Siedle, has filed a mandamus action against respondent, the State Teachers Retirement System of Ohio ("STRS"). Siedle requests this court issue a writ of mandamus ordering STRS to comply with his requests for public records under Ohio's Public Records Act.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this court referred this matter to a magistrate. The magistrate issued the appended decision, including findings of fact and conclusions of law, recommending that this court grant the requested writ of mandamus with regard to two of Siedle's records requests.

Pursuant to Civ.R. 53, STRS objected to the magistrate's decision, asserting three objections:

> 1. Relator has the burden to establish a clear legal right to the requested relief by clear and convincing evidence. The Magistrate's Decision improperly flipped the burden on STRS by extensively relying upon Relator's unsupported and conclusory affidavit.
>
> 2. The phrase *all contracts* in the Investment Managers Request is overbroad. The limiting phrase "including any private placement memorandum, offering documents and subscription agreements" does not negate that the request seeks *all contracts*.
>
> 3. STRS responded to Relator's Panda Investment Request by providing all responsive documents that STRS in good faith believed it possessed. The Magistrate's Decision effectively penalized STRS's assistance in proactively providing some documents to Relator instead of issuing a blanket denial to his requests.

(Emphasis in original.) (Respondent's Objs. to the Mag.'s Decision at i.)

**{¶ 3}** We must independently review the magistrate's decision to ascertain if "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). We "may adopt or reject a magistrate's decision in whole or in part, with or without modification." Civ.R. 53(D)(4)(b).

**{¶ 4}** In his complaint, Siedle requested a writ of mandamus ordering STRS to respond to 22 records requests. The magistrate, however, recommended that we issue a writ ordering STRS to provide records in response to only two of Siedle's requests: (1) the first request made in Siedle's February 19, 2021 letter, the first "investment managers request," and (2) the first request made in Siedle's June 26, 2021 letter, the first "Panda Investments request." The first investment managers request asked STRS to disclose "[a]ll contracts, including any private placement memoranda, offering documents and subscription agreements, between STRS and its investment managers." (Siedle's Evidence at 4.) Siedle limited this request to contracts from "the past 6 years." *Id.* In the first Panda Investments request, Siedle sought "[a]ny prospectus, private placement memorandum, subscription agreement, or similar document for any Panda Investment. These records are

investment disclosure and solicitation documents prepared by Panda Investments." (Siedle's Evidence at 18.)

**{¶ 5}** The Ohio Public Records Act requires a public office to make copies of public records available to any person upon request within a reasonable period of time. R.C. 149.43(B)(1). A requester of public records may compel compliance with the Act by seeking a writ of mandamus. R.C. 149.43(C)(1)(b). To prove entitlement to the writ, the requester must establish by clear and convincing evidence a clear legal right to the requested records and a clear legal duty on the part of the public office to provide them. *State ex rel. Brinkman v. Toledo City School Dist. Bd. of Edn.*, 2024-Ohio-5063, ¶ 6. Courts construe Ohio's Public Records Act liberally to allow broad public access and resolve any doubt in favor of disclosure of public records. *State ex rel. Summers v. Fox*, 2020-Ohio-5585, ¶ 27.

**{¶ 6}** By its first objection, STRS argues that the magistrate erred in relying on an affidavit Siedle submitted in determining that he demonstrated by clear and convincing evidence a clear legal right to the records sought in the first investment managers request. We disagree.

**{¶ 7}** " '[I]t is the responsibility of the person who wishes to inspect and/or copy records to identify with reasonable clarity the records at issue.' " *State ex rel. Morgan v. New Lexington*, 2006-Ohio-6365, ¶ 29, quoting *State ex rel. Fant v. Tober*, 1993 Ohio App. LEXIS 2591, *4 (8th Dist. Apr. 28, 1993), *aff'd*, 68 Ohio St.3d 117 (1993). "A public office may deny a request as overbroad if the office 'cannot reasonably identify what public records are being requested.' " *State ex rel. Cleveland Assn. of Rescue Emps. v. Cleveland*, 2023-Ohio-3112, ¶ 17, quoting R.C. 149.43(B)(2).

**{¶ 8}** STRS denied Siedle's first investment managers request as overbroad. In its April 15, 2021 response to the investment managers requests, STRS claimed that Siedle failed to specifically and particularly identify the records he sought. Before the magistrate, STRS addressed the investment managers requests cumulatively, instead of explaining why it found the first investment managers request, in particular, overbroad. Only a portion of STRS's argument is relevant to the first investment managers request. In that portion, STRS argued:

> STRS is a public pension system whose primary function is investing and accounting. Words like "prospectus,"

> "correspondence," "audit report," "performance report," "financial statement," "reports," "operational audits," "organizational materials," "statements," and other similarly vague requested categories could apply to hundreds of thousands of documents scattered throughout all departments. . . . STRS cannot reasonably pull potentially hundreds of thousands of documents that Relator may or may not want to review. "To prove the negative" that there are no other records out there responsive to the request would require STRS to search all its files to ensure compliance with the request.

(Brief of Respondent at 31.)

{¶ 9} Thus, STRS argued that Siedle requested such broad, indefinite categories of documents that STRS had hundreds of thousands of documents that could be responsive to Siedle's requests. STRS, therefore, maintained that it could not reasonably identify and retrieve the documents Siedle sought.

{¶ 10} The magistrate rejected STRS's contention that Siedle requested vague categories of documents in his first investment managers request by relying, in part, on Siedle's affidavit. In his affidavit, Siedle explained that he is a licensed attorney, and he has "been involved in financial services, specifically institutional investing, [his] entire career." (Siedle's Evidence at 34.) Siedle has been the president of Benchmark Financial Services, Inc. for the past 20 years. While with Benchmark Financial Services, Inc., he has performed forensic audits of over $1 trillion in public pension funds, including the North Carolina Retirement System; the Rhode Island Retirement System; the City of Jacksonville Police Retirement System; the cities of Nashville and Chattanooga, Tennessee; the Shelby County, Tennessee Retirement System; the towns of Longboat Key and Jupiter, Florida; US Air Pilot's Pension Fund; and the New York State Teamsters Pension.

{¶ 11} Siedle averred in his affidavit that he used terms in his record requests that have special meaning in the investment industry. These terms included:

> (1) "private placement memorandum," which Siedle defined as a "document [that] provides a formal description of an investment opportunity written to comply with various federal securities regulations. The term 'private placement memorandum' is used in pension investing routinely and is a part of the research and due diligence process undertaken prior to investing," and

> (2) "subscription agreement," which Siedle defined as "an agreement that defines the terms for a party's investment into a private placement offering or a limited partnership. The term 'subscription agreement' is used in pension investing routinely and is a part of the research and due diligence process undertaken prior to investing."

(Emphasis deleted.) *Id.* at 35.

{¶ 12} Based on Siedle's testimony that "private placement memorandum" and "subscription agreement" both have a specific definition in the investment industry, the magistrate concluded that STRS understood or should have understood the particular meanings of those terms. The magistrate, therefore, rejected STRS's contention that the terms "private placement memorandum" and "subscription agreement" lacked such clarity that STRS could not reasonably determine what Siedle was requesting.

{¶ 13} In its first objection, STRS initially argues that the magistrate should have disregarded Siedle's affidavit testimony because it contains legal arguments and conclusions. The magistrate relied on Siedle's testimony as to the definitions of certain terms used in the pension investing industry. This testimony constitutes neither a legal argument nor a legal conclusion, but rather, expert opinion. STRS does not challenge the relevancy of Siedle's testimony or contend the criteria of Evid.R. 702 are not met. Siedle's testimony, therefore, is admissible expert opinion.

{¶ 14} Second, STRS argues that Siedle's affidavit testimony constitutes hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying . . . , offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). In his affidavit testimony, Siedle did not reiterate any particular out-of-court statement, but rather, he explained how certain terms are generally used and understood in the pension investing industry. Siedle's testimony, therefore, is not hearsay.

{¶ 15} Finally, STRS protests that it did not have the benefit of Siedle's affidavit testimony prior to the initiation of this mandamus action. As Siedle testified, the definitions he provided of "private placement memorandum" and "subscription agreement" apply across the pension investing industry. As a member of that industry, STRS understood or should have understood those definitions before Siedle stated them in

his affidavit. If STRS disagreed with the definitions Siedle articulated in his affidavit, it had the opportunity to offer contrary evidence into the court record. It did not do so.

{¶ 16} In sum, we are not persuaded that the magistrate erred in considering Siedle's affidavit. Accordingly, we overrule STRS's first objection.

{¶ 17} By its second objection, STRS argues that the phrase "[a]ll contracts" in the first investment managers request is overbroad. When viewed in context with the remainder of the request, we disagree that the phrase "[a]ll contracts" is overbroad.

{¶ 18} Initially, STRS asserts that the magistrate removed the phrase "[a]ll contracts" from the request and limited it a request for "any private placement memoranda, offering documents and subscription agreements." (Respondent's Objs. to the Mag.'s Decision at 13.) STRS misreads the magistrate's decision. The magistrate recognized that "Siedle sought a particular category of records—i.e., contracts, including those specifically named record types—between STRS and STRS's investment managers." (App'x Mag.'s Decision at 85.) The magistrate, therefore, did not excise the phrase "[a]ll contracts" from the first investment managers request.

{¶ 19} Next, STRS contends that by requesting "[a]ll contracts" between it and its investment managers for a period of six years, Siedle impermissibly sought a complete duplication of its files. The magistrate concluded that Siedle's request was sufficiently constrained that it did not require a complete duplication of STRS's files. The magistrate reasoned that unlike the broad requests at issue in other cases, the first investment managers request contained limiting language: it sought specific, defined types of records; prescribed that STRS and a STRS investment manager must be parties to the records; and specified a six-year lookback period. Additionally, the magistrate found relevant that STRS pointed to no evidence that the first investment managers request would result in the production of a burdensomely voluminous quantity of records.

{¶ 20} Supreme Court of Ohio precedent decided since the issuance of the magistrate's decision only strengthens the conclusion that Siedle did not request a complete duplication of STRS's files. In *Brinkman*, the requester filed two public records requests, each seeking "any agreement or correspondence" related to a public office's retention of legal services in a particular matter. *Brinkman*, 2024-Ohio-5063, at ¶ 9. The Supreme Court held that the requester's "use of the word 'any' d[id] not by itself make the requests

overbroad, nor did he request a complete duplication of voluminous records, because that term is limited by the remaining language of each request." *Id.* "The text of the requests conveyed that [the requester] was seeking particular records—namely, the engagement letters or equivalent correspondence. This case is thus distinguishable from those in which requesters submitted open-ended requests for voluminous records." *Id*. at ¶ 10.

{¶ 21} Based on *Brinkman*, we determine that the word "all," like "any," does not render a request overbroad if the remainder of the request identifies the records sought with reasonable clarity. Here, Siedle provided that clarity by requesting defined types of records, entered into by specific parties, within certain temporal parameters.[1]

{¶ 22} STRS also now complains about the difficulty and burden it could face in responding to the first investment managers request. STRS directs this court to its 2020 Comprehensive Annual Financial Report, which lists 187 investment managers across 5 categories of assets. The large number of investment managers could potentially indicate an extensive number of records responsive to Siedle's request. STRS, however, offers no record evidence as to the approximate number of responsive records involved, the manner in which it maintains its records with regard to its investment managers, or the effort needed to search for and retrieve the requested records. Instead, STRS relies on a combination of conjecture and extrinsic evidence to outline the problems it *could* face in responding to the first investment managers request. Given the lack of record evidence, we cannot find that the magistrate erred in concluding that STRS did not establish that the first investment managers request would result in the production of a burdensomely voluminous quantity of records.

{¶ 23} STRS also asserts that the first investment managers request seeks more voluminous documents than the alternative investment requests, which the magistrate found were overly broad and improperly sought the complete duplication of voluminous files. However, the first investment managers request and the alternative investment requests are different. Instead of asking for specific types of records, like the first

---

[1] While Siedle did not define "offering documents" in his affidavit, the magistrate concluded that STRS understood the particular type of records sought by the term "offering documents" because STRS used that term, along with the term "prospectus," in its records retention schedule. STRS's record retention schedule categorized both offering documents and prospectuses as investment research. We do not agree with STRS that the magistrate equated offering documents with prospectuses.

investment managers request, the alternative investment requests sought broad, loosely defined categories of records, such as "Externally Managed Investments – Organizational Materials" and "Internally Managed Investments – Private Markets – Establishment/Organizational Materials." (Siedle's Evidence at 28.) Given the difference in the breadth of the requests at issue, the first investment managers request and the alternative investments requests are not comparable.

**{¶ 24}** Next, STRS asks this court to allow additional briefing and evidentiary submission on the issue of why the phrase "[a]ll contracts" is overly broad and undefined. Before ruling on objections to a magistrate's decision, a court "may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate." Civ.R. 53(D)(4)(d). Under this rule, a court has broad discretion in deciding whether to hear additional evidence. *Glass v. Eshun*, 2025-Ohio-90, ¶ 9 (10th Dist.); *In re Name Change of E.S.*, 2022-Ohio-2107, ¶ 19 (10th Dist.). Here, STRS has not even argued, much less demonstrated, that it could not, with reasonable diligence, have produced the additional evidence for the magistrate's consideration. We thus decline to hear any additional evidence or accept further briefing based on additional evidence.

**{¶ 25}** Finally, STRS asks this court to limit the language of the first investment managers request so that it only requires the production of private placement memoranda, offering documents, and subscription agreements relating to alternative investment managers. We decline to so truncate Siedle's request.

**{¶ 26}** In sum, we reject STRS's arguments that the first investment managers request was overbroad because it sought "[a]ll contracts." Accordingly, we overrule STRS's second objection.

**{¶ 27}** By its third objection, STRS argues that, even though it provided some records in response to the first Panda Investments request, that request is impermissibly overbroad. We disagree.

**{¶ 28}** STRS first argues that magistrate penalized it because it provided some records in response to the first Panda Investments request, while also asserting that the request was overbroad. The magistrate pointed out that STRS understood the first Panda Investments request well enough to provide two subscription agreements involving the

Panda Investments entities.  Thus, the magistrate concluded, "[t]he production of the subscription agreements demonstrates that Siedle's first request provided sufficient clarity for STRS to understand the records sought by Siedle even without a specified time frame." (App'x Mag.'s Decision at 97.)

**{¶ 29}** As we stated above, "[a] public office may deny a request as overbroad if the office 'cannot reasonably identify what public records are being requested.' " *State ex rel. Cleveland Assn. of Rescue Emps.*, 2023-Ohio-3112, at ¶ 17, quoting R.C. 149.43(B)(2). Here, the disclosure of two responsive documents militated against STRS's assertion that the lack of a time frame rendered the first Panda Investments request overbroad.  To the extent that STRS could reasonably identify requested records, even without the date of the records sought, the request did not qualify as overbroad.

**{¶ 30}**   Next, STRS argues that the first Panda Investments request is overbroad because it required STRS to identify a specific subset of records containing selected information.  We disagree.

**{¶ 31}** "The Public Records Act does not compel a public office 'to do research or to identify records containing selected information.' " *State ex rel. Shaughnessy v. Cleveland*, 2016-Ohio-8447, ¶ 10.  Consequently, a public records request cannot "require the government agency to [] search through voluminous documents for those that contain certain information." *State ex rel. Carr v. London Corr. Inst.*, 2015-Ohio-2363, ¶ 22.  "A records request that places the burden on the public office to identify the responsive documents by searching for specified content is not a proper records request." *State ex rel. Griffin v. Sehlmeyer*, 2022-Ohio-2189, ¶ 11.

**{¶ 32}** In the first Panda Investments request, Siedle asked STRS to disclose "[a]ny prospectus, private placement memorandum, subscription agreement, or similar document for any Panda Investment."  (Siedle's Evidence at 18.)  By this request, Siedle identified the records he sought by naming particular types of documents; not by describing the information contained in the documents.  Consequently, the first Panda Investments request did not require STRS to search through records looking for those with specified content.

**{¶ 33}** Additionally, we find that STRS interprets the first Panda Investments request in a manner that increases its scope.  After setting forth his request for "[a]ny

prospectus, private placement memorandum, subscription agreement, or similar agreement," Siedle clarified that "[t]hese records are investment disclosure and solicitation documents prepared by the Panda Investments." *Id.* STRS construes this second sentence as a further request for undefined investment disclosure and solicitation records, as well as "any record transmitted to STRS that discusses any Panda Investment." (Respondent's Objs. to the Mag.'s Decision at 27.) However, Siedle's second sentence does not *ask* for any record; instead, it *describes* "[t]hese records"—the records listed in the first sentence—to assist STRS in identifying the listed records. Therefore, STRS's overly broad interpretation of the first Panda Investments request is erroneous.

{¶ 34} Finally, STRS argues that as to the first Panda Investments request, the mandamus claim is moot. We disagree.

{¶ 35} Generally, providing the requested records to the requester in a public-records mandamus case renders the mandamus claim moot. *State ex rel. Ames v. Concord Twp. Bd. of Trustees*, 2025-Ohio-1027, ¶ 30. "A public office may establish by affidavit that all existing public records have been provided." *State ex rel. Frank v. Clermont Cty. Prosecutor*, 2021-Ohio-623, ¶ 15. A court will not deny a writ as moot "based solely on an unsupported assertion by [a public office] that it has already produced the responsive records." *State ex rel. WTOL Television, L.L.C. v. Cedar Fair, L.P.*, 2023-Ohio-4593, ¶ 20.

{¶ 36} In its objections, STRS represented to this court that "[a]fter the Magistrate's Decision was issued, . . . STRS identified two additional potentially responsive records and provided those records to [Siedle] contemporaneously with the filing of these Objections." (Respondent's Objs. to the Mag.'s Decision at 28-29.) This statement does not moot Siedle's mandamus claim as to the first Panda Investments request for two reasons. First, STRS only states that it turned over two more records; critically, it does *not* assert that it has provided all responsive records to the first Panda Investments request. Second, STRS provided no proof to support the unverified assertion that it provided additional responsive records. Siedle's mandamus claim, therefore, is not moot.

{¶ 37} In sum, we conclude that the first Panda Investments request is not overbroad and that Siedle's mandamus claim as to that request is not moot. Accordingly, we overrule STRS's third objection.

{¶ 38} Following an independent review of this matter, we overrule all three of STRS's objections, and we adopt the magistrate's decision.  In accordance with the magistrate's decision, we grant Siedle a writ of mandamus ordering STRS to comply with Siedle's first investment managers request in the February 19, 2021 letter and the first Panda Investments request in the June 26, 2021 letter.  STRS may withhold or redact records that are not subject to disclosure under exceptions to the Public Records Act.  Moreover, we return this matter to the magistrate for briefing and submission of any evidence regarding Siedle's requests for awards of statutory damages, court costs, and attorney fees.

*Objections overruled*;
*writ of mandamus granted.*

DORRIAN and EDELSTEIN, JJ., concur.

_____

# APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Edward Siedle, | : | |
| Relator, | : | |
| v. | : | No.  22AP-375 |
| | : | |
| State Teachers Retirement System of Ohio, | : | (REGULAR CALENDAR) |
| Respondent. | : | |
| | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

#### Rendered on July 26, 2024

---

*Advocate Attorneys, LLP*, *Andrew M. Engel*, and *Marc E. Dann*, for relator.

*Isaac Wiles & Burkholder LLC*, *Donald C. Brey*, and *Ryan C. Spitzer*, for respondent.

---

### IN MANDAMUS

{¶ 39} Relator Edward Siedle seeks a writ of mandamus ordering respondent State Teachers Retirement System of Ohio ("STRS") to comply with Siedle's requests for records under Ohio's Public Records Act.

## I. Findings of Fact

{¶ 40} 1. Siedle is a Florida attorney who describes himself as having been extensively involved in all aspects of investment compliance and governance throughout his career. In 2021, Siedle filed multiple requests for public records with STRS.

{¶ 41} 2. STRS is the body established to manage, under the authority of the State Teachers Retirement Board, funds for the payment of retirement allowances and other benefits under R.C. Chapter 3307 for the teachers of the public schools of Ohio. *See* R.C. 3307.03. STRS is a public office within the meaning of Ohio's Public Records Act. (STRS Answer at 2.)

{¶ 42} 3. In a February 19, 2021 letter,[2] Siedle, through counsel, made a public records request with STRS. The letter contained groups of requests split between multiple different categories. Among those categories, Siedle made nine individually numbered requests for "Documents Regarding Investment Managers" (hereinafter, "investment managers requests"). (Siedle's Evidence at 4.)

{¶ 43} 4. Joy L. Nelson, an STRS records and documentation administration manager, acknowledged receipt of Siedle's February 19, 2021 letter in a February 25, 2021 email to Siedle's counsel. Beginning on March 15, 2021, Nelson sent a series of emails containing thousands of pages of records responsive to portions of Siedle's records requests other than the investment managers requests. Nelson noted that the response would require multiple emails over a period of time due to the volume of records requested.

{¶ 44} 5. On April 15, 2021, Nelson sent Siedle's counsel an email responding to the certain investment managers requests. In part, Nelson informed Siedle that the request was overly broad, stating: "Concerning the above items, I must note that much of your request is overly broad and fails to satisfy the requirement of public records law that you specifically and particularly identify the records that you are seeking." (Siedle's Evidence at 10; STRS's Evidence at 2824.) Nelson also stated that "[t]o the extent that you have requested records containing specific information, rather than identifying the specific records you seek, your request is inappropriate under applicable legal standards." *Id.* Nelson invited Siedle to identify with sufficient clarity any specific records that he would like to request. Furthermore, Nelson provided a "link to the 2020 Comprehensive Annual Financial Report" to assist Siedle in identifying records to request. (STRS's Evidence at 2824.)

---

[2] Although the letter is dated February 19, 2020, other evidence and statements, including statements in relator's brief, demonstrate that the letter was actually sent in 2021.

{¶ 45} 6. On May 18, 2021, Nelson informed Siedle's counsel that STRS would be mailing a portable drive containing thousands of pages of records in response to the two of the investment managers requests. Nelson stated that the portable drive contained "1 Request for Proposals (RFP) and the 50 RFP Responses (and associated attachments) we also believe to be responsive." (STRS's Evidence at 3465). On May 21, 2021, Nelson sent another email responding to the second and third investment managers requests.

{¶ 46} 7. In a letter dated June 2, 2021, Siedle, through counsel, made a second public records request with STRS. Siedle sought records related to "Panda Energy International, Inc. and/or any Panda Power Fund" in six individually numbered requests. (Siedle's Evidence at 13; STRS's Evidence at 4301.)

{¶ 47} 8. On June 17, 2021, Nelson responded by email to one of the requests in Siedle's June 2, 2021 letter. Nelson stated that "much of your request fails to satisfy the requirement of public records law that you specifically and particularly identify the records that you are seeking." (STRS's Evidence at 4356.) Nevertheless, Nelson stated that "in the interest of openness, this office has voluntarily made an effort to identify readily available public records that are responsive and we are providing the 37 reports we believe to be responsive." (STRS's Evidence at 4357.) All of the reports sent by Nelson contained the following title:

**STRS Ohio Quarterly Alternative Investment Report**
**Opportunistic/Diversified Portfolio[.]**

(hereinafter "STRS Quarterly Alternative Investment Report") (STRS's Evidence at 4304-84.) Nelson invited Siedle to identify with sufficient clarity any additional records sought.

{¶ 48} 9. On June 25, 2021, Nelson responded by email to the two of the listed requests in Siedle's June 2, 2021 letter. Nelson again stated that "much of your request fails to satisfy the requirement of public records law that you specifically and particularly identify the records that you are seeking." (Siedle's Evidence at 15; STRS's Evidence at 4385.) Nelson invited Siedle to identify with sufficient clarity any additional records sought. With regard to the sixth request, Nelson stated that STRS had no responsive records.

{¶ 49} 10. Siedle responded to Nelson's June 25, 2021 email in a letter dated June 26, 2021. Siedle indicated that he sought to reframe his June 2, 2021 request to remove the noted deficiency and "clarify the precise investments my requests involve."

(Siedle's Evidence at 18.) Siedle noted that in his prior request, he inquired regarding "STRS investments in 'Panda Energy International, Inc. and/or any Panda Power Fund.' " (Siedle's Evidence at 18.) To the extent his initial request did not encompass them, Siedle asked to supplement his request to include the following investments, which Siedle referred to collectively as "Panda Investments":

> Panda Power Generation Infrastructure Fund B, LLC
>
> Panda Sherman Power Holdings, LLC
>
> Panda Temple Power II Holdings, LLC
>
> Panda Power Fund II B, L.P.
>
> Panda Liberty Holdings, LLC
>
> Panda Patriot Holdings, LLC

(Siedle's Evidence at 18.) Related to the above-listed Panda Investments, Siedle made seven individually numbered requests for records (hereinafter, the "Panda Investments requests"):

> 1. Any prospectus, private placement memorandum, subscription agreement, or similar document for any Panda Investment. These records are investment disclosure and solicitation documents prepared by the Panda Investments.
>
> 2. Any investment contract, partnership agreement, or operating agreement to which both STRS and a Panda Investment are parties. These records form the actual contractual relationship between STRS and each Panda Investments.
>
> 3. All correspondence, memorandum, reports, emails, or text messages transmitted between STRS (or any of its employees or agents) and any Panda Investment. These records are the written communications between STRS and the Panda Investments.
>
> 4. Any performance report, financial statement, audit report, or similar document provided to STRS by or on behalf of any Panda Investment. These records document the performance and value of STRS's investment in the Panda Investments that were prepared by the Panda Investments.
>
> 5. Any performance report, financial statement, audit report, or similar document prepared by any STRS employee or agent for any Panda Investment. These records document the

performance and value of STRS's investment in the Panda Investments that were prepared by STRS staff.

6. Any performance report, financial statement, audit report, or similar document prepared for STRS by any accountant or external investment consultant or adviser for any Panda Investment. These records document the performance and value of STRS's investment in the Panda Investments that were prepared by third-parties.

7. Any record, including, but not limited to, correspondence, memorandum, reports, emails, or text messages, prepared or transmitted by or to STRS or any of its employees or agents that discuss any Panda Investment. The records are the internal written communications of STRS staff that discuss the Panda Investments.

(Siedle's Evidence at 18-19.) Siedle stated that "[a]lthough I am unfamiliar with STRS's record-keeping system," he expected that "responsive records could be located through electronic searches for the word 'Panda' or the individual name of the six listed Panda Investments." (Siedle's Evidence at 19.) Siedle further stated that "[t]o the extent any responsive records are in paper format, I would expect them to be maintained in physical files for the six identified Panda Investments." (Siedle's Evidence at 19.)

{¶ 50} Additionally, Siedle made three requests for records that he described as "more general in nature" (hereinafter, "request for general records"), including a copy of STRS's document retention policies and procedures, a copy of any log or register of documents destroyed by STRS over the past five years related to alternative investments, and any record that lists or defines the types of records STRS prepares, receives, uses, or maintains regarding alternative investments. (Siedle's Evidence at 19.) Siedle noted that to the extent documents had already been produced that were responsive to the requests in this communication, they need not be reproduced.

{¶ 51} 11. On June 30, 2021, Nelson responded by email to Siedle's June 26, 2021 request for general records. In response to the request for STRS's document retention policies and procedures, Nelson attached two documents: (1) the STRS Records and Information Management Guidelines, and (2) STRS's Record Retention Schedule. Nelson stated that STRS had no records responsive to the request for a copy of any log or register of documents destroyed by STRS over the past five years. Regarding the request for any

record that listed or defined the types of records STRS employed regarding alternative records, Nelson stated that the request failed to specifically and particularly identify the records sought and found the request to be "in part, overly broad due to a lack of timeframe, as well as failure to identify the type of or specific 'documents' you are seeking." (Siedle's Evidence at 21; STRS's Evidence at 4387.) Nevertheless, Nelson stated that the records retention schedule may address that request.

{¶ 52} 12. On June 30, 2021, Nelson responded by email to Siedle's June 2 and June 26, 2021 requests for records, stating that it was the intent of STRS to "combine these two requests, primarily referring to the supplemental request." (Siedle's Evidence at 24; STRS's Evidence at 4411.) With regard to the first, second, third, fifth, and seventh-listed requests in the supplemental request for Panda Investments records, Nelson stated the following:

> Each request is overly broad and fails to satisfy the requirements of public records law that you specifically and particularly identify the records that you are seeking.
>
> Concerning items one and two, in addition to being overly broad, your request failed to give a time period. That said, in the interest of openness, this office has voluntarily made an effort to identify readily available public records responsive related to seven (7) Panda Power funds. Due to the volume of records, there will be multiple emails sent containing the records.
>
> Item numbers three and seven are similar to item number two on your original request and continue to be overly broad. Much of your request fails to satisfy the requirement of public records law that you specifically and particularly identify the records that you are seeking. * * * Your request was, in part, overly broad due to a lack of timeframe, as well as a failure to identify the type of or specific "documents" you are seeking.
>
> A public office is not required to conduct research or otherwise "seek out and retrieve those records which would contain the information of interest to the requester." * * * To the extent that you have requested records containing specific information, rather than identifying the specific records you seek, your request is inappropriate under applicable legal standards. If there are specific records you would like to request, please identify those with sufficient clarity.

> Concerning item five, we believe the reports previously provided on June 17, 2021 under the original request number four fulfills this request.

(Internal citation omitted.) (Siedle's Evidence at 24-25; STRS's Evidence at 4412.) Nelson again invited Siedle to identify with sufficient clarity any additional records sought. Including a second email sent on the same day, Nelson provided over 900 pages of records in response to first and second requests for Panda Investments records in Siedle's June 26, 2021 letter.

{¶ 53} 13. On July 27, 2021, Nelson again responded by email to Siedle's June 2 and June 26, 2021 requests for records. With regard to the fourth and sixth-listed requests, Nelson essentially reiterated statements in the June 30, 2021 email indicating that Siedle's request was overly broad and failed to specifically and particularly identify the records sought. Nelson repeated her prior comment that the "request was, in part, overly broad due to a lack of timeframe, as well as a failure to identify the type of or specific 'documents' you are seeking." (STRS's Evidence at 5364.) Nelson also repeated her invitation for Siedle to identify with sufficient clarity any additional records sought. Nelson stated that, absent clarification, this was the final response to Siedle's June 2 and June 26, 2021 requests for records.

{¶ 54} 14. In a letter dated October 8, 2021, Siedle, through counsel, supplemented his February 19, 2021 records request. Siedle stated that the document categories were derived from the STRS record retention schedule. Siedle sought "[f]or each investment identified in any STRS Ohio Quarterly Alterative Investment Report prepared by or for STRS Ohio since January 1, 2015," the production of records related to alternative investments in nine separately listed requests (hereinafter, "alternative investments requests"). (Siedle's Evidence at 28.) Siedle also sought a number of other records for the prior six years in five separately listed requests. These requests include annual audit schedules for investment, investments performance measurement, performance verification reports, historical performance reporting, and insurance policies.

{¶ 55} 15. Nelson acknowledged receipt of Siedle's October 8, 2021 letter on October 12, 2021. On October 27, 2021, Nelson responded by email to Siedle's alternative investments requests. Nelson essentially repeated her statements in the June 30 and

July 27, 2021 emails indicating that Siedle's request was overly broad and failed to specifically and particularly identify the records sought. Nelson stated that Siedle's request was "in part, overly broad due to a failure to identify the type of or specific 'documents' you are seeking within selected categories of the records retention schedule." (STRS's Evidence at 5371.) Nelson reiterated her statement in the June 30, 2021 email that "[t]o the extent that you have requested records containing specific information, rather than identifying the specific records you seek, your request is inappropriate under applicable legal standards." (STRS's Evidence at 5371.) Nelson repeated her invitation for Siedle to identify with sufficient clarity any additional records sought. Nelson also stated: "We provided you with the Opportunistic/Diversified Alternative Investment reports in past public records requests. Please clarify if you are referring to these as 'STRS Ohio Quarterly Alternative Investment Reports' and what records you seek regarding those reports." (STRS's Evidence at 5371.)

{¶ 56} 16. On October 27, 2021, Siedle's counsel requested a copy of the STRS public record policy. In response, on October 28, 2021, Nelson again sent Siedle's counsel a copy of the STRS Records and Information Management Guidelines previously provided on June 30, 2021.

{¶ 57} 17. On November 12, 2021, Nelson responded to certain requests in Siedle's October 8, 2021 supplemental request for records. Nelson again stated that STRS provided Siedle the "Opportunistic/Diversified Alternative Investment reports in response to past public record requests dated June 2, 2021 and June 26, 2021." (STRS Evidence at 5384.) Nelson restated her request that Siedle "[p]lease clarify if you are referring to these as 'any STRS Ohio Quarterly Alternative Investment Reports prepared by or for STRS Ohio since January 1, 2015' and if so, what records you seek regarding those reports." (STRS's Evidence at 5384.)

{¶ 58} 18. Nelson responded once more to Siedle's October 8, 2021 supplemental request for records in a December 10, 2021 email. Reiterating STRS's objection to the October 8, 2021 supplemental request for records as overly broad and failing to specifically and particularly identify the records sought, Nelson provided some records responsive to one of Siedle's requests that was not related to alternative investments. Nelson again stated that STRS provided Siedle the "Opportunistic/Diversified Alternative Investment reports"

in response to Siedle's June 2 and June 26, 2021 public records requests. (Siedle's Evidence at 31; STRS Evidence at 5487.) Nelson reiterated her request that Siedle clarify if he was referring to any of those reports when referring to " 'any STRS Ohio Quarterly Alternative Investment Reports prepared by or for STRS Ohio since January 1, 2015.' " (Siedle's Evidence at 31; STRS's Evidence at 5487.) Nelson again indicated that Siedle's request was "in part, overly broad due to a failure to identify the type of specific 'documents' you are seeking within selected categories of the records retention schedule." (Siedle's Evidence at 31; STRS's Evidence at 5487.) Nelson stated that, absent clarification from Siedle, this would be the final communication in response to the records requests.

{¶ 59} 19. There were no additional communications between Siedle or STRS following Nelson's December 10, 2021 email.

{¶ 60} 20. On June 28, 2022, Siedle filed his complaint in this court. Siedle sought a writ of mandamus ordering STRS to provide the requested records without redaction.[3] In addition to a general request for any other available relief, Siedle sought statutory damages, costs, and attorney fees under R.C. 149.43(C).

## II. Discussion and Conclusions of Law

{¶ 61} Siedle seeks a writ of mandamus ordering STRS to comply with Siedle's public records requests. Siedle also seeks relief on the basis that STRS failed to comply with R.C. 149.43(B)(2) when denying Siedle's requests.[4]

---

[3] It is noted that in Siedle's complaint, he requested the issuance of a "Peremptory Writ of Prohibition." (Compl. at 8.) However, the other portions of Siedle's complaint, including the caption and other references to mandamus, make clear that he actually sought the issuance of a writ of mandamus, not prohibition. For example, immediately prior to his prayer for relief, Siedle stated that he is "entitled to a writ of mandamus." (Compl. at 8.) Thus, the magistrate finds the request for a writ of prohibition to be a typographical error and considers Siedle's complaint as one sounding in mandamus.

[4] Siedle refers to R.C. 149.43(C)(2) in his principal brief. However, in citing to this section, Siedle actually quotes from R.C. 149.43(B)(2). STRS points this out in its brief, stating that it was "address[ing] R.C. 149.43(B)(2) and presum[ing] [Siedle's] repeated citations to (C)(2) were in error." (STRS's Brief at 37.) In his reply brief, Siedle clarifies that he is arguing STRS "violated R.C. 149.43(B)(2)." (Siedle's Reply Brief at 11.) In his complaint, Siedle stated that "at no time has [STRS] provided [Siedle] with the information required by R.C. 149.43(B)(2)." (Compl. at 2.) Because Siedle raised R.C. 149.43(B)(2) in his complaint, Siedle quoted from R.C. 149.43(B)(2) in his principal brief, and STRS addressed Siedle's arguments as pertaining to R.C. 149.43(B)(2), the magistrate finds Siedle's reference to R.C. 149.43(C)(2) in his principal brief was a harmless typographical error.

## A. Ohio Public Records Law

{¶ 62} Ohio's Public Records Act, which is codified at R.C. 149.43, requires that "requestors have full access to public records unless the requested records fall within one of the exceptions specifically enumerated in the act." *State ex rel. Fair Housing Opportunities of Northwest Ohio v. Ohio Fair Plan*, 10th Dist. No. 20AP-351, 2022-Ohio-385, ¶ 7, citing *State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*, 88 Ohio St.3d 166, 170 (2000). *See also State ex rel. McDougald v. Greene*, 161 Ohio St.3d 130, 2020-Ohio-3686, ¶ 9. "The Public Records Act reflects [Ohio's] policy that 'open government serves the public interest and our democratic system.' " *State ex rel. Glasgow v. Jones*, 119 Ohio St.3d 391, 2008-Ohio-4788, ¶ 13, quoting *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, ¶ 20. *See White v. Clinton Cty. Bd. of Commrs.*, 76 Ohio St.3d 416, 420 (1996) ("[P]ublic scrutiny is necessary to enable the ordinary citizen to evaluate the workings of his or her government and to hold government accountable. If the public can understand the rationale behind its government's decisions, it can challenge or criticize those decisions as it finds necessary; the entire process thus allows for greater integrity and prevents important decisions from being made behind closed doors.").

{¶ 63} Public records include "any document, device, or item, regardless of physical form or characteristic, including an electronic record as defined in section 1306.01 of the Revised Code, created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." R.C. 149.011(G). "A 'public record' does not include '[r]ecords the release of which is prohibited by state or federal law.' " *State ex rel. Mobley v. Ohio Dept. of Rehab. & Corr.*, 169 Ohio St.3d 39, 2022-Ohio-1765, ¶ 13, quoting R.C. 149.43(A)(1)(v). The Public Records Act "must be construed liberally in favor of broad access to records kept by public offices, and any doubt is to be resolved in favor of disclosure of the records." *State ex rel. Wallace v. State Med. Bd.*, 89 Ohio St.3d 431, 433 (2000).

## B. Mandamus in Public Records Cases

{¶ 64} Mandamus is an appropriate remedy to compel compliance with Ohio's Public Records Act. *State ex rel. Physicians Commt. for Responsible Medicine v. Bd. Of*

*Trustees of Ohio State Univ.*, 108 Ohio St.3d 288, 2006-Ohio-903, ¶ 6; R.C. 149.43(C)(1)(b). "To prevail on a claim for mandamus relief in a public-records case, a party must establish a clear legal right to the requested relief and a corresponding clear legal duty on the part of the respondent to provide that relief." *State ex rel. Ellis v. Maple Hts. Police Dept.*, 158 Ohio St.3d 25, 2019-Ohio-4137, ¶ 5. Although a court must construe the Public Records Act liberally in favor of broad access and resolve any doubts in favor of disclosure, the relator still bears the burden to establish entitlement to the relief in mandamus by clear and convincing evidence. *State ex rel. Horton v. Kilbane*, 167 Ohio St.3d 413, 2022-Ohio-205, ¶ 8. " 'Clear and convincing evidence' is a measure or degree of proof that is more than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard required in a criminal case; clear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *State ex rel. Ware v. Crawford*, 167 Ohio St.3d 453, 2022-Ohio-295, ¶ 14, citing *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14.

## C. Whether Siedle's Requests Are Overly Broad or Ambiguous

{¶ 65} Siedle identifies three specific groups of requests that remain at issue in this matter: (1) a portion of the investment managers requests in the February 19, 2021 letter; (2) a portion of the Panda Investments requests in the June 26, 2021 letter; and (3) the alternative investments requests in the October 8, 2021 letter. STRS argues Siedle is not entitled to relief because his requests were overly broad or ambiguous.

{¶ 66} It is well-established that the person making a public records request bears the burden of identifying with reasonable clarity the records at issue. *State ex rel. Kesterson v. Kent State Univ.*, 156 Ohio St.3d 22, 2018-Ohio-5110, ¶ 22. Failing to meet this burden, either because the request is overly broad or ambiguous, renders the request improper and unenforceable. *See State ex rel. Zidonis v. Columbus State Community College*, 133 Ohio St.3d 122, 2012-Ohio-4228, ¶ 27. Several cases provide useful context in considering whether a public records request is overly broad or ambiguous such that the public office responding to the request cannot reasonably identify the public records being requested.

{¶ 67} A request for "all traffic accident reports of record" from a city police chief, county sheriff, and highway patrol superintendent was found by this court to be overly

broad. *State ex rel. Zauderer v. Joseph*, 62 Ohio App.3d 752, 754 (10th Dist.1989). In *Zauderer*, this court stated that "[t]he indefiniteness of such a request renders it incapable of being acted upon and certainly unsuitable for mandamus." *Id.* at 756. Characterizing the request as a "general request," this court stated that such a request "even if it could be defined, is, first, unreasonable in scope and, second, if granted, would interfere with the sanctity of the recordkeeping process itself." *Id.* Denying the request for mandamus, this court held that "R.C. 149.43 does not contemplate that any individual has the right to a complete duplication of the voluminous files kept by government agencies." *Id.* Rather, "[t]he right to inspection is circumscribed by endangerment to the safety of the record and/or unreasonable interference with the discharge of the duties of the records custodian." *Id.*

{¶ 68} In *Glasgow*, the requester sought "broad categories of records (e-mail messages, text messages, written correspondence) sent and received" by a member of the Ohio House of Representatives from the time the representative began serving in that office—a period of approximately six months. *Glasgow*, 2008-Ohio-4788, at ¶ 17. Because the request specifically mentioned that it included, but was not limited to, communications related to 2007 Sub.H.B. No. 151 ("H.B. 151"), the representative "interpreted the request addressed to her to be limited to records related to H.B. No. 151 or the general subject of divestiture of investments in Iran and Sudan" and provided some records in accordance with this interpretation. *Id.* at ¶ 9. The Supreme Court of Ohio held that insofar as the requester sought all of the representative's "work-related e-mail messages, text messages, and correspondence during her entire tenure as state representative, the request was improper because it was overly broad" and represented a request for "what approximated a 'complete duplication' " of the representative's files. *Id.* at ¶ 19. The court also found that the representative "acted appropriately in restricting her response to [the] request to records related to H.B. No. 151 and the divestiture of investments in Iran and Sudan." *Id.*

{¶ 69} Similar to *Glasgow,* in a case in which the requester sought all of the records relating to a prison quartermaster's orders for and receipts of clothing and shoes for a period of over seven years, the request was found to be overly broad because it amounted to a complete duplication of the quartermaster's records. *State ex rel. Dehler v. Spatny*, 127 Ohio St.3d 312, 2010-Ohio-5711, ¶ 3. In another case where the Supreme Court of Ohio

found the request to be overly broad, the requester sought "any and all records generated * * * containing any reference whatsoever to Kelly Dillery" from a city police department. *State ex rel. Dillery v. Icsman*, 92 Ohio St.3d 312, 314 (2001). Although the requester in *Dillery* contended on appeal that she wanted access only to offense and incident reports, the court found the requester "failed in her duty to identify the records she wanted with sufficient clarity" because the requester did not specify this limitation in her request. *Id.*

{¶ 70}  In *Zidonis*, the requester sought a college's complaint files and litigation files. *Zidonis*, 2012-Ohio-4228, at ¶ 21. The request for these "broad categories of records" encompassed "a lengthy period of time—at least six years and potentially much longer, because for both records categories, [the requester] specified the college's records-retention schedule period of six years from when these files were last active." *Id.* The requester argued before the Supreme Court of Ohio that her request was sufficiently specific because, in part, the request followed the language of the college's records retention schedule. However, the court found that a records request is not sufficiently specific merely because the request names a broad category of records listed on an agency's records retention schedule. The court stated that "[r]equests for each of these record categories without any temporal or content-based limitation would likely be overbroad even though the categories are so named in the schedule." *Id.* at ¶ 26. In so finding, the court emphasized that "[m]anifestly, each request—and each retention category when the request is structured after such a category—must be analyzed under the totality of facts and circumstances." *Id.*

{¶ 71}  In *Kesterson*, the requester sought "all records of communications" between certain individuals at a university concerning specific subjects. *Kesterson*, 2018-Ohio-5110, at ¶ 23. The university claimed that the request for communications was unenforceable because it was overly broad. While noting the requester "cast a wide net for 'communications,' " the Supreme Court of Ohio found the request was not overly broad because the requester "limited each request temporally, by subject matter, and in all but one instance, by the specific employees concerned." *Id.* at ¶ 25. The court found this request did not involve the " 'complete duplication' of anyone's files, nor does any individual request approach the type of vague and impermissibly broad request that we refused to enforce in *Glasgow*, *Dillery*, or *Zidonis*." *Id.*

{¶ 72} With these cases and concepts in mind, each of Siedle's outstanding requests must be considered in turn under the totality of the facts and circumstances.

*1. Investment Managers Requests*

{¶ 73} Siedle requests that STRS be ordered to comply with certain investment managers requests contained in his February 19, 2021 letter. In his brief, Siedle states that only the first, fifth, sixth, and seventh investment managers requests remain at issue in this matter.[5] Siedle specified in the February 19, 2021 communication that these requests were for the prior six years.

{¶ 74} Initially, STRS argues that Siedle's investment managers requests fail because they consist of "broad discovery-style requests which mandate STRS to search all its records to determine items 'related to' various broad categories." (STRS's Brief at 31.) STRS points to Siedle's third, fourth, eighth, and ninth investment managers requests as examples of requests involving improper research. Although some of Siedle's requests in the February 19, 2021 letter included requests for records "related to" particular topics, Siedle does not seek relief regarding those requests in this action. STRS's argument is therefore without merit.

{¶ 75} STRS raises a number of other arguments in support of its assertion that Siedle's requests were improper. These arguments will be addressed with respect to each of the remaining investment managers requests.

*a. First Investment Managers Request*

{¶ 76} In his first investment managers request, Siedle sought "[a]ll contracts, including any private placement memoranda, offering documents and subscription agreements, between STRS and its investment managers." (Siedle's Evidence at 4.) STRS

---

[5] In the conclusion of his principal brief, Siedle states he is seeking production of the following records from the February 19, 2021 communication: "Documents Regarding Investment Managers 1, 5, 6, 7, 8, and 9." (Siedle's Brief at 18.) However, Siedle repeatedly states in the same brief that only requests 1, 5, 6, and 7 from the investment managers requests remain at issue. *See* Siedle's Brief at 7 (stating that he is seeking "Documents Regarding Investment Managers: 1, 5, 6, and 7"); Siedle's Brief at 15. Additionally, Siedle "concede[d] that Request Nos. 8 and 9 (Documents Regarding Investment Managers) in the February 19, 2021 letter were overly broad because they did not define the specific documents requested." (Siedle's Brief at 6.) Therefore, because Siedle has conceded that eighth and ninth investment managers requests are overly broad, the magistrate disregards Siedle's statement that he continues to seek fulfillment of such requests.

raises no arguments specifically directed at Siedle's first investment managers' request. STRS points to Nelson's statements to relator in arguing the request was "overly broad or failed to specifically and particularly identify the records being sought." (STRS's Brief at 5.) STRS also argues that, in general, the investment managers requests were improper because they required STRS to search for specific information as opposed to records.

{¶ 77} Public records requests have been found to be invalid where the request requires the records custodian to perform improper research. *See Kesterson,* 2018-Ohio-5110, at ¶ 26; *State ex rel. Shaughnessy v. Cleveland*, 149 Ohio St.3d 612, 2016-Ohio-8447, ¶ 10; *State ex rel. Morgan v. New Lexington*, 112 Ohio St.3d 33, 2006-Ohio-6365, ¶ 30. "[T]o constitute improper research" under the Public Records Act, "a record request must require the government agency to either search through voluminous documents for those that contain certain information or to create a new document by searching for and compiling information from existing records." *State ex rel. Carr v. London Corr. Inst.*, 144 Ohio St.3d 211, 2015-Ohio-2363, ¶ 22.

{¶ 78} In his affidavit submitted as part of the record in this matter, Siedle offered explanations of some of these types of records, stating:

> In responding to my several requests for records, STRS routinely claimed that my requests relating to alternative investments were vague and did not clearly specify the records I was looking for. These assertions are baseless. I was quite specific in my request by using terms that are used in the investment industry. By way of example, I asked for the following types of records:
>
> *       **private placement memorandum** – This document provides a formal description of an investment opportunity written to comply with various federal securities regulations. The term "private placement memorandum" is used in pension investing routinely and is a part of the research and due diligence process undertaken prior to investing.
>
> *       **subscription agreement** – This subscription agreement is an agreement that defines the terms for a party's investment into a private placement offering or a limited partnership. The term "subscription agreement" is used in pension investing routinely and is a part of the research and due diligence process undertaken prior to investing.

(Siedle's Evidence at 35.) Siedle did not define or otherwise characterize the term "[o]ffering documents," which was used in his first investment managers request. However, the term "offering documents" appears in STRS's records retention schedule alongside the term "prospectus" under the category of investment research.[6] (STRS's Evidence at 22841.)

{¶ 79} STRS has not offered any evidence to rebut Siedle's statements regarding private placement memoranda or subscription agreements. Instead, STRS states in its brief that "[w]ords like 'prospectus,' 'correspondence,' 'audit report,' 'performance report,' 'financial statement,' 'reports,' 'operational audits,' 'organizational materials,' 'statements,' and other similarly vague requested categories could apply to hundreds of thousands of documents scattered through all departments." (STRS's Brief at 31.) Although STRS argues that the terms listed in its brief—many of which are not included in the records request at issue—*could* apply to hundreds of thousands of documents, STRS does not point to any evidence that there actually *are* such voluminous results when searching for the types of records identified in the first investment managers request. Indeed, STRS does not offer any evidence that it attempted a search for records responsive to this request. There is, therefore, no support for finding that the request would require STRS to search through voluminous documents for those that contain certain information. *See State ex rel. Summers v. Fox*, 163 Ohio St.3d 217, 2020-Ohio-5585, ¶ 75 (stating that the public office "has not presented evidence that the manner in which such records are maintained * * * — or the number of employees whose files would need to be searched—made the request prohibitively difficult to comply with"). Nor has STRS specifically explained how Siedle's first investment managers request required STRS to perform improper research.

{¶ 80} In support of its argument that Siedle's requests were overly broad because of their inclusion of these terms, STRS cites to *Gupta v. Cleveland*, Ct. of Cl. No. 2017-00840PQ, 2018-Ohio-3475. *Gupta* is not dispositive in this matter for several reasons. First, *Gupta* is a report and recommendation made by a special master of the Court of Claims. While potentially persuasive, decisions of the Court of Claims are not binding

---

[6] A prospectus is commonly defined as "a preliminary printed statement that describes an enterprise (as a business or publication) and that is distributed to prospective buyers, investors, or participants." *Merriam-Webster's Collegiate Dictionary* 998 (11th Ed.2003).

authority on this court. *Dillon v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 22AP-392, 2023-Ohio-942, ¶ 59. Importantly, however, this report and recommendation is not a decision. *See* R.C. 2743.75(F)(2). Research reveals no indication that this report and recommendation was ever adopted by the court. For this reason alone, *Gupta* provides no authority on any question presented in this matter.

{¶ 81} Second, even if *Gupta* was to be considered, it would not support STRS's position. In that case, the special master faulted the requests at issue because they "use[d] undefined terms" rather than "identifying with reasonable clarity the records sought within broad categories or topics." *Gupta* at ¶ 27. Here, the record contains evidence that the terms at issue are defined and limited such that they have a particular meaning that was or should have been understood by STRS. In addition to Siedle's unrefuted statements, STRS's records retention schedule contained the terms "prospectus" and "offering documents." Moreover, STRS provided two subscription agreements related to the Panda Investments in response to Siedle's later requests. This constitutes evidence that STRS understood or should have understood the types of records sought by Siedle.

{¶ 82} Additionally, STRS responded to the second and third investment managers requests by providing four requests for proposals ("RFP") and approximately 55 responses to the RFPs from investment managers or investment funds. In the absence of any evidence from STRS to the contrary, this provides some support for finding STRS understood Siedle's usage of the term "investment managers." Because the requests were for defined types of records, STRS has not shown it was required to create a new document by searching for and compiling information from existing records. For the above reasons, *Gupta* is not dispositive of the questions presented in this matter.

{¶ 83} In sum, STRS has not pointed to any specific evidence in the record demonstrating Siedle's first investment managers request required STRS to search through voluminous documents for those that contain certain information or create new documents by searching for and compiling information from existing records. As a result, the magistrate finds this request did not require STRS to perform improper research. *See Morgan*, 2006-Ohio-6365, at ¶ 33-34; *Carr*, 2015-Ohio-2363, at ¶ 22.

{¶ 84} Next, STRS invokes the general principle that "the Public Records Act 'does not contemplate that any individual has the right to a complete duplication of voluminous

files kept by government agencies.' " *Zidonis*, 2012-Ohio-4228, at ¶ 21, quoting *State ex rel. Warren Newspapers, Inc. v. Hutson*, 70 Ohio St.3d 619, 624 (1994). In requesting all contracts between STRS and its investment managers over a six-year period, Siedle undoubtedly formed a broad request. However, based on the evidence in the record, the magistrate concludes this request is less burdensome than others that have been found to involve a complete duplication of voluminous records. Siedle's first investment managers request was unlike *Zidonis*, in which the requester sought entire categories of records without any limitation based on content. Nor was this request like *Dillery*, in which the requester sought all records involving particular content.

{¶ 85} Instead, Siedle's first investment managers request contained meaningful limitations when considered in light of evidence in the record. Siedle sought a particular category of records—i.e., contracts, including those specifically named record types—between STRS and STRS's investment managers. Siedle also narrowed his request to a defined period of time—six years. Granted, this is a substantial period of time for a request for a category of records such as contracts, potentially even when limited to those involving investment managers. However, STRS has not pointed to evidence, beyond general arguments in its brief, that this particular request would result in the production of a burdensomely voluminous quantity of records. *See Warren Newspapers* at 624-25 (rejecting public officials' argument that the public records request was overly burdensome because the "assertions regarding the amount of documents and budgetary and employee constraints are not supported by submitted evidence"); *Summers*, 2020-Ohio-5585, ¶ 84 ("With respect to overbreadth, the county has merely asserted the defense without offering any support. The request is more specific than those that courts have deemed overly broad, as discussed above. The county's true objection appears to be that the request is burdensome, but it has offered no evidence in support. We cannot simply credit a bare assertion that a request is overbroad or burdensome."). As a result, STRS's argument that the request was overly broad because it required complete duplication of voluminous records is not well-taken.

{¶ 86} Therefore, considering the totality of the facts and circumstances, Siedle's first investment managers request was not overly broad or ambiguous. *See Warren Newspapers* at 624 (finding that although a request for internal investigations from 1988

to 1993 and all incident reports or traffic tickets written in 1992 was "admittedly broad," it nevertheless was a permissible public records request in that it sought "files in certain categories from specific years in the same manner in which they are organized by respondents"). As a result, Siedle has demonstrated STRS improperly denied his request on this basis.

*b. Fifth, Sixth, and Seventh Investment Managers Requests*

{¶ 87} In his fifth, sixth, and seventh investment managers requests, Siedle asked for "all valuations performed or submitted to STRS by any investment fund or investment fund manager," "all independent third party valuations of hard-to-value assets in the possession of STRS," and "all evaluations of the value of asset provided by investment funds or investment fund managers engaged by STRS." (Siedle's Evidence at 4.) In support of its argument that Siedle's requests required improper research, STRS states that the fifth, sixth, and seventh investment managers requests "ask[ed] for 'all documents' pertaining to categories of records covering a six-year period." (STRS's Brief at 32.)

{¶ 88} These requests differ in meaningful ways from Siedle's first investment managers request. With regard to the first investment managers request, evidence in the record, including Siedle's affidavit and STRS's records retention schedule, provided support for finding the requested records were types of documents that STRS should have been able to reasonably identify. With regard to the fifth, sixth, and seventh investment managers requests, however, Siedle does not point to or provide any evidence demonstrating that the records requested were reasonably identifiable.

{¶ 89} Because evidence does not support finding the records at issue were reasonably identifiable, Siedle's requests were ambiguous. The terms "valuations" or "evaluations," as used in the records requests, do not appear in STRS's record retention schedule. The term "hard-to-value assets" in the sixth investment managers request is also not defined. Thus, Siedle does not demonstrate that he sought defined, identifiable types of *records*, as opposed to types of *information* in the fifth, sixth, and seventh investment managers requests. As a result, STRS did not err by denying the requests because they required improper research. *Compare Shaughnessy*, 2016-Ohio-8447, at ¶ 9-11 (finding records request seeking police reports for a two-week period from two police districts for

"all non domestic violence related aggravated assaults or assaults where the victims sought medical care at a hospital" constituted improper research because it required the agency to identify a specific subset of records containing selected information), *with Carr*, 2015-Ohio-2363, at ¶ 21-23 (finding request did not involve improper research where the request "identified a particular record authored by a named individual, specifying to whom it was sent and a time frame during which it was sent" and the requester provided "unrefuted evidence by way of his affidavit that" certain individuals with the agency "were able to verify the existence of the record").

**{¶ 90}** Therefore, considering the totality of the facts and circumstances, Siedle's fifth, sixth, and seventh investment managers requests failed to identify with reasonable clarity the records sought.

*2. Panda Investments Requests*

**{¶ 91}** Next, Siedle requests that STRS be ordered to comply with certain Panda Investments requests contained in his June 26, 2021 letter. Siedle states that only certain portions of these requests remain at issue. Siedle notes that STRS "did produce the limited partnership agreements (Req. No. 2) and the subscription agreements (Req. No. 1) for Panda Power Generation Infrastructure Fund B and Panda Power Fund II." (Siedle's Brief at 11.) As a result, Siedle states that he is not seeking the limited partnership or operating agreements for any of the Panda Investments or subscription agreements for Panda Power Generation Infrastructure Fund B and Panda Power Fund II. As a result, only a portion of the first Panda Investments request and the third through seventh Panda Investments requests remain at issue.

**{¶ 92}** STRS asserts in general terms that Siedle's Panda Investment requests were overly broad or ambiguous for the same reasons STRS offered in support of its denial of the investment managers requests. Additionally, STRS argues the Panda Investment requests were deficient because Siedle failed to provide a time frame for the requested records. STRS notes that it provided Siedle some records despite this deficiency. Neither Siedle's June 2 nor June 26, 2021 letters to STRS included any time frame for the records sought. Siedle does not claim otherwise in this matter, but instead argues that the lack of a time frame is not fatal to the requests.

{¶ 93} The Public Records Act does not specifically mandate that a requester include the date of the records at issue in the request. Indeed, a request that does not specify the date of the records may still be considered sufficiently clear and, therefore, valid. *See Morgan*, 2006-Ohio-6365, at ¶ 37 (stating that "we have never held that in order to constitute a viable request, the requester must specify the author and date of the records requested"); *State ex rel. Ware v. Rhodes*, 10th Dist. No. 22AP-59, 2023-Ohio-2400, ¶ 26 (finding that the omission of a date of a requested record did not under the facts and circumstances of the case mean that the requester had failed to sufficiently identify the requested record). Providing the author and date of a record "may be helpful in identifying the requested records," but "the failure to do so does not automatically result in an improper request for public records, particularly where * * * it is evident that the public office was aware of the specific records requested." *Id*. *See also Carr*, 2015-Ohio-2363, at ¶ 23 (stating that while the requester "did not provide a precise date on which the requested memo had been sent, we have never required that level of specificity when a document is otherwise reasonably identifiable"). Rather, in determining whether a request reasonably identifies the records sought, the responding agency must consider the totality of the facts and circumstances surrounding the request. *See Zidonis* at ¶ 26; *Morgan* at ¶ 33.

{¶ 94} In his brief, Siedle cites to a news article to support his statement that "[b]etween 2011 and 2013, [STRS] invested over $525M in a group of private funds called Panda Power Funds" and that "[b]y the end of 2018, [STRS's] investments in six of the Panda Investments were worth nothing." (Siedle's Brief at 9.) In his reply brief, Siedle references these assertions in stating that the Panda Investments "were made between 2011 and 2013, and STRS recognized them as worthless in 2018." (Siedle's Reply Brief at 10.) From this, Siedle states that the "investment documents (offering documents, subscription agreements, and contracts) would have been created between 2011 and 2013, with perhaps some attachments thereafter." (Siedle's Reply Brief at 11.) Further, Siedle states that the "financial statements, performance reports, and audit reports would be routine records covering each investment's performance over the years" and that "[s]uch reports would usually be made monthly, quarterly and/or annually." (Siedle's Reply Brief at 11.)

{¶ 95} The article referenced by Siedle is not in the record, nor does Siedle contend that he provided the article to STRS in support of his Panda Investment requests in his June

26, 2021 letter. Siedle also does not support his contentions regarding the timing of the financial statements, performance reports, and audit reports with reference to matters in the record. Therefore, the magistrate disregards Siedle's statements made in reliance on the article cited in his brief and Siedle's statements concerning the timing of the financial statements, performance reports, and audit reports. Nevertheless, as Siedle is correct that the omission of a time frame from a records request does not necessarily render such request invalid, it is necessary to consider whether each of the Panda Investments requests is reasonably clear and not overly broad.

*a. First Panda Investments Request*

{¶ 96} In his first Panda Investments request in the June 26, 2021 letter, Siedle sought "[a]ny prospectus, private placement memorandum, subscription agreement, or similar document for any Panda Investment." (Siedle's Evidence at 18.) Siedle explained that "[t]hese records are investment disclosure and solicitation documents prepared by the Panda Investments." *Id.*

{¶ 97} It is evident that STRS understood Siedle's Panda Investments requests in the June 26, 2021 letter well enough to provide some of the specific records requested. STRS provided multiple contractual agreements between STRS and various Panda Investments entities, thereby responding to the second-listed Panda Investments request. The production of these records provides some evidence that STRS understood the general subject matter to which Siedle was referring, i.e., the Panda Investments. More importantly with regard to Siedle's first request, STRS provided two subscription agreements involving Panda Power Fund II B, L.P. and Panda Power Generation Infrastructure Fund GP, L.P., two of the entities named as Panda Investments in Siedle's June 26, 2021 letter. The production of the subscription agreements demonstrates that Siedle's first request provided sufficient clarity for STRS to understand the records sought by Siedle even without a specified time frame.

{¶ 98} Other facts and circumstances in the record demonstrate that Siedle's request was reasonably clear and not overly broad. First, a series of records produced by STRS provide useful context in considering whether Siedle's request was reasonably clear under all the facts and circumstances. STRS's records retention schedule specifically identified

"investment research" as a category of records, listing "prospectus" and "offering documents" as identified document types within this category. (STRS's Evidence at 22841.) Moreover, in response to a request in Siedle's June 2, 2021 letter for "[a]ny document that pertains to any return on, or return of, any investment by STRS with Panda Energy International, Inc. and/or any Panda Power Fund," Nelson provided 37 STRS Ohio Quarterly Alternative Investment Reports from the fourth quarter of 2011 through the first quarter of 2021, with the exception of the first quarter of 2012. (STRS's Evidence at 4302.) These reports listed information related to the various Panda Investments including, the year of the initial investment, the total commitment, the funded commitment, the unfunded commitment, distributions, and current market value. The initial investment dates for all of the Panda Investments were between 2011 and 2013.

{¶ 99} Second, Siedle's description of the records as "investment disclosure and solicitation documents" in his June 26, 2021 letter provided some context for when the records would have been created, especially when considered together with evidence in the record regarding the years the investments were initially created. (Siedle's Evidence at 18.) Third, Siedle explains in his June 26, 2021 letter that these records would have been "prepared by the Panda Investments," thereby informing STRS of the entities responsible for producing the records in question. *Id.*

{¶ 100} Fourth, in his affidavit submitted in this matter, Siedle provided further support for his argument that STRS should have been able to reasonably identify the records in question. According to Siedle, the terms used in the request are types of documents common in pension investing. As previously discussed, Siedle described the terms "private placement memorandum" and "subscription agreement," noting that these terms were "used in pension investing routinely" and were "part of the research and due diligence process undertaken prior to investing." (Siedle's Evidence at 35.) Siedle's descriptions of these terms provide unrefuted evidence that the terms are commonly used and understood in pension investing by entities such as STRS.

{¶ 101} Fifth, Siedle stated in his June 26, 2021 letter that "[a]lthough I am unfamiliar with STRS's record-keeping system," he expected that "responsive records could be located through electronic searches for the word 'Panda' or the individual name of the six listed Panda Investments." (Siedle's Evidence at 19.) Siedle further stated that "[t]o the

extent any responsive records are in paper format, I would expect them to be maintained in physical files for the six identified Panda Investments." (Siedle's Evidence at 19.) STRS has offered no evidence that it conducted a search using the methodology suggested by Siedle or that it was unable to employ this methodology based on the nature of its recordkeeping system.

{¶ 102} In conclusion, Siedle's first Panda Investments request is not a model of a perfect request, especially due to Siedle's failure to provide a time frame for the records sought. However, public records requests need not be perfect, just reasonably clear and not overly broad. *See Morgan*, 2006-Ohio-6365, ¶ 37 ("We do not require perfection in public-records requests."). The first Panda Investments request identified specific record types. The request was narrowed to include those records prepared by a limited number of named entities—the Panda Investments. Other evidence in the record, particularly STRS's production of two of the subscription agreements, demonstrates that STRS was aware of some of the record types requested by Siedle. The above factors tend to demonstrate that Siedle's request is reasonably clear and more limited than some of the aforementioned cases involving overly broad requests. Moreover, the request is not rendered ambiguous or overly broad because Siedle failed to provide a specific time frame in his June 2 or June 26, 2021 letters.

{¶ 103} Next, it is necessary to address STRS's incorporation of arguments made with regard to the investment managers requests. STRS does not explain with any specificity how these arguments apply to the first Panda Investments request. Therefore, these arguments, such as they are, will be treated in brief. Initially, as with the first investment managers request, the first Panda Investments request did not involve improper research because STRS has not demonstrated it was required to search through voluminous documents for those that contain certain information. Because this request was for defined types of records prepared by the Panda Investments, not requests for information, STRS has not shown it was required to create a new document by searching for and compiling information from existing records. Thus, the first Panda Investments request did not involve improper research.

{¶ 104} Aside from the lack of time frame, STRS does not specifically explain how this request was ambiguous or overly broad. Nor has STRS demonstrated with reference to

evidence in the record that this request was overly broad because it required complete duplication of voluminous files. Therefore, considering the totality of the facts and circumstances, the magistrate finds that Siedle's first Panda Investments request was not overly broad or ambiguous. As a result, Siedle has demonstrated STRS improperly denied his request on this basis.

*b. Third and Seventh Panda Investments Requests*

{¶ 105} Siedle's third and seventh Panda Investments requests sought records of various types of communications related to the Panda Investments. In the third request, Siedle sought "[a]ll correspondence, memorandum, reports, emails, or text messages transmitted between STRS (or any of its employees or agents) and any Panda Investment," explaining that "[t]hese records are the written communications between STRS and the Panda Investments." (Siedle's Evidence at 18.) In the seventh request, Siedle sought "[a]ny record, including, but not limited to, correspondence, memorandum, reports, emails, or text messages, prepared or transmitted by or to STRS or any of its employees or agents that discuss any Panda Investment," explaining that "[t]he records are the internal written communications of STRS staff that discuss the Panda Investments." (Siedle's Evidence at 19.) These requests were overly broad.

{¶ 106} By requesting all written communications in the various listed categories pertaining to the Panda Investments, Siedle's third and seventh Panda Investments requests resembled the request found to be overly broad in *Dillery*, in which the requester sought "any and all records generated * * * containing any reference whatsoever to Kelly Dillery." *Dillery*, 92 Ohio St.3d at 314. By requesting in seventh request any record serving as a written communication "prepared or transmitted by or to **STRS** or **any of its employees** or **agents** that discuss any Panda Investment," Siedle has not meaningfully limited the scope of the request by author. (Emphasis added.) (Siedle's Evidence at 19.) Similarly, in his third request, Siedle sought the identified written communications "transmitted between **STRS** (or **any of its employees** or **agents**) and any Panda Investment." (Emphasis added.) (Siedle's Evidence at 18.) Additionally, several categories of records in these requests were open-ended. For example, there is no limitation on the types of correspondence, memoranda, or reports sought by Siedle. The term "reports" alone

could implicate any number of types or categories of records identified in STRS's record retention schedule.

{¶ 107} Moreover, like all of the Panda Investment requests, these requests were not limited by a particular time frame. Unlike the first Panda Investments request, however, nothing in the record—or, for that matter, in Siedle's arguments—suggests any kind of temporal limitation. This leaves the requests open from any time before the date of the initial investments identified in the STRS Ohio Quarterly Alternative Investment Report all the way to the date of Siedle's letter. Therefore, considering the totality of the facts and circumstances, the magistrate finds Siedle's third and seventh Panda Investments requests were overly broad. *See Dillery* at 314; *Salemi v. Cleveland Metroparks*, 8th Dist. No. 100761, 2014-Ohio-3914, ¶ 26. *Compare Kesterson*, 2018-Ohio-5110, at ¶ 26 (stating that "request for e-mails sent or received by a specific individual regarding a specific topic during a reasonably short time period is not the type of request that we have previously found to constitute impermissible research").

*c. Fourth, Fifth, and Sixth Panda Investments Requests*

{¶ 108} In the fourth, fifth, and sixth Panda Investments requests, Siedle sought the same specific categories of records, namely "[a]ny performance report, financial statement, audit report, or similar document." (Siedle's Evidence at 19.) The requests differed with regard to the party responsible for the preparation or provision of the record. In the fourth request, Siedle sought the above-identified records "provided to STRS by or on behalf of any Panda Investment," explaining that "[t]hese records document the performance and value of STRS's investment in the Panda Investments that were prepared by the Panda Investments." *Id.* In the fifth request, Siedle sought the above-identified records "prepared by any STRS employee or agent for any Panda Investment," explaining that "[t]hese records document the performance and value of STRS's investment in the Panda Investments that were prepared by STRS staff." *Id.* In the sixth request, Siedle sought the above-identified records "prepared for STRS by any accountant or external investment consultant or adviser for any Panda Investment," explaining that "[t]hese records document the performance and value of STRS's investment in the Panda Investments that were prepared by third-parties." *Id.*

{¶ 109} As previously mentioned, Siedle states in his reply brief that the "financial statements, performance reports, and audit reports would be routine records covering each investment's performance over the years." (Siedle's Reply Brief at 11.) In his affidavit, Siedle provided the following explanation of the term "financial statements":

> Financial statements are written records that convey the business activities and the financial performance of a company. "Financial statements" include the balance sheet, income statement, statement of cash flow, and statement of changes in equity. The term 'financial statement' is used generally in business and investing and reports on the value and performance of a particular investment.

(Siedle's Evidence at 35.) Siedle's description of this term differs from others in Siedle's affidavit. Siedle explained that the terms "subscription agreement" and "private placement memorandum" referred to a particular type of document or agreement. Unlike those terms, the term "financial statements," as explained by Siedle, appears to be a category of records encompassing other specific types of records. However, Siedle did not list these particular types of records in his records request. *See Dillery* at 314.

{¶ 110} Moreover, the terms "performance reports" and "audit reports" are not explained by Siedle. These terms could apply to any number of records under STRS's records retention schedule. Unlike Siedle's first Panda Investments requests, in which Siedle sought defined and bounded categories of records, these requests are open-ended and undefined. *See Zidonis* at ¶ 26. Even if one considered the term "financial statements" to be a defined category of records—and the evidence on this point is inconclusive at best considering the records retention schedule and absence of other indication in the record that STRS was aware of the types of records sought—other factors support finding these requests to be ambiguous or overly broad.

{¶ 111} The fourth, fifth, and sixth Panda Investments requests were not meaningfully limited by author or the person responsible for the creation of the requested records. In the fifth request, Siedle sought the requested types of records for the Panda Investments that had been "prepared by **any STRS employee** or **agent**." (Emphasis added.) (Siedle's Evidence at 19.) In the sixth request, Siedle sought the requested types of records that were prepared for STRS "by **any accountant** or **external investment consultant** or **adviser.**" (Emphasis added.) *Id.* Although perhaps slightly more bounded

in scope, in the fourth request, Siedle sought the requested types of records that were "provided to STRS by or **on behalf of** any Panda Investment," thereby not limiting the entity responsible for providing the records to only the Panda Investments themselves. (Emphasis added.) *Id.* The open-ended nature of entities or individuals responsible for preparing or providing these records weighs in favor of finding the request overly broad.

{¶ 112} Additionally, Siedle states in his reply brief that the financial statements, performance reports, and audit reports "would usually be made monthly, quarterly and/or annually." (Siedle's Reply Brief at 11.) Even if Siedle supported this statement with reference to evidence in the record, which he does not, it would not provide a sufficient limitation with regard to the length or period of time encompassed by the request. Considering the dates of STRS's investments in the Panda Investments, as detailed in the STRS Ohio Quarterly Alterative Investment Reports, in conjunction with Siedle's statements that the requested records "document the performance and value of STRS's investment in the Panda Investments," it may be possible to infer that Siedle sought the requested records from the time that STRS made its initial investments to the date of the records requests, or, alternatively, the termination of the investments. (Siedle's Evidence at 19.) However, this lengthy period is not a significant enough limitation to prevent the requests from being overly broad or ambiguous when considered in conjunction with the aforementioned factors. *See Salemi* at ¶ 26. Therefore, considering the totality of the facts and circumstances, the magistrate finds that Siedle's fourth, fifth, and sixth Panda Investments requests were overly broad and failed to identify the records sought with reasonable clarity.

*3. Alternative Investments Requests*

{¶ 113} Next, Siedle requests that STRS be ordered to comply with the alternative investments requests contained in the October 8, 2021 letter. In his alternative investments requests, Siedle sought "[f]or each investment identified in any STRS Ohio Quarterly Alternative Investment Report prepared by or for STRS Ohio since January 1, 2015," the following records:

> 1. Externally Managed Investments – Due Diligence and Monitoring

(Risk Models, Portfolio analysis, organization charts, contacts, reports, slides, compliance documents)

2. Externally Managed Investments – Organizational Materials
(Establishment documents; e.g. origination documentation, contracts, authorization emails, IMA)

3. Internally Managed Investments – Private Markets - Monitoring
(1 pager, volatility strategy, performance schedules, financial models)

4. Internally Managed Investments – Private Markets – Establishment / Organizational Materials
(Establishment documents, origination documents, due diligence, subscription, communications, financial statements, capital calls, filings, NDA, LPA, TPA, side letter contract)

5. Investment Research
(Prospectus, Offering documents)

6. Tax Returns
(STRS Ohio entity returns and K-1's and other tax documentation from JV's and external funds)

7. External Manager Statements

8. External Operational Audits
(External operation audits relating to Investment Performance)

9. Investment Manager Agreements.

(Siedle's Evidence at 28.) On October 27, 2021, in response to Siedle's request, Nelson stated: "We provided you with the Opportunistic/Diversified Alternative Investment reports in past public records requests. Please clarify if you are referring to these as 'STRS Ohio Quarterly Alternative Investment Reports' and what records you seek regarding those reports." (STRS's Evidence at 5371.) On November 12 and December 10, 2021, Nelson stated that STRS provided Siedle the "Opportunistic/Diversified Alternative Investment reports in response to past public record requests dated June 2, 2021 and June 26, 2021." (STRS's Evidence at 5384, 5487.)

{¶ 114} STRS points to Nelson's requests for clarification in defending its denial of Siedle's alternative investments requests. Siedle responds that STRS's confusion regarding the reports in question was "feigned." (Siedle's Reply Brief at 7.) As previously mentioned,

in response to Siedle's June 2, 2021 letter, STRS sent Siedle a series of reports, each of which was titled as follows:

**STRS Ohio Quarterly Alternative Investment Report**
**Opportunistic/Diversified Portfolio[.]**

(STRS's Evidence at 4304-84.)

{¶ 115} STRS's confusion regarding the reports referenced by Siedle in his alternative investments requests was not reasonable. Although Siedle did not include the second line containing the phrase "Opportunistic/Diversified Portfolio," Siedle's request included the entire first line of the report title. Furthermore, as Siedle points out, "STRS never produced a document entitled 'Opportunistic/Diversified Alternative Investment reports.' " (Siedle's Reply Brief at 7.) Perhaps even more tellingly, in the table of contents submitted along with STRS's evidence in this matter, STRS itself referred to the reports in question as "Quarterly Alternative Investment Report[s]," not "Opportunistic/Diversified Alternative Investment reports." *Compare* STRS's Submission of Evidence, Table of Contents at 20-22 *with* STRS's Evidence at 5371. Because STRS's confusion regarding the reports to which Siedle was referring was not reasonable, Siedle was under no obligation to answer Nelson's request for clarification. *See State ex rel. McDougald v. Greene*, 163 Ohio St.3d 471, 2020-Ohio-5100, ¶ 15 ("R.C. 149.43(B)(2) authorizes the rejection of a public-records request as ambiguous only when the office cannot 'reasonably' identify the records sought. Greene's confusion regarding whether McDougald was seeking reports for specific dates was not reasonable. And if Greene's demand for clarification was not reasonable, then there is no authority for the proposition that McDougald must nevertheless try to satisfy that demand before he may file suit.").

{¶ 116} Although Siedle's request was clear regarding the particular reports at issue, it nevertheless was an improper request because it was overly broad. Siedle states that his alternative investment requests "sought to employ [STRS's] own classifications of records by pulling language from [STRS's] record retention schedule." (Siedle's Brief at 15.) Indeed, large parts of Siedle's alternative investment requests exactly copied entire portions of STRS's records retention schedule.

{¶ 117} Siedle sought the listed categories of records for **each** of the investments listed in the STRS Ohio Quarterly Alternative Investment Report since January 1, 2015.

There were 25 reports matching this description attached to Nelson's June 17, 2021 emails to Siedle.[7] Each of the reports contained dozens of listed investments. Nor were all of the investments listed in each of the reports the same. For example, several of the Panda Investments that appeared in the March 31, 2015 report were not in the March 31, 2021 report. The March 31, 2021 report alone listed at least 121 different investments. By seeking broad categories of records for all of investments in the reports over a period of more than six years, Siedle's requests were akin to or perhaps even surpassed those requests found to have been overly broad in *Zidonis*, *Zauderer*, *Glasgow*, and *Dehler*. Nelson repeatedly stated that these requests for broad categories within the records retention schedule were overly broad and failed to specifically identify the types of records sought. Siedle never responded. Therefore, considering the totality of the facts and circumstances, the magistrate finds that Siedle's alternative investments requests were overly broad and improperly sought the complete duplication of voluminous files.

### C. Whether STRS Violated R.C. 149.43(B)(2)

{¶ 118} Siedle argues STRS violated R.C. 149.43(B)(2) by denying his requests as overly broad and lacking clarity without properly affording him an opportunity to revise the requests. In arguing that it complied with the statute's requirements, STRS states: "In sum, R.C. 149.43(B)(2) generally requires offering to discuss revisions with the requester or providing the requester with a copy of the office's records retention schedule." (STRS's Brief at 38.) This is not an accurate summary of the statute's requirements for a public office that denies a public records request as ambiguous or overly broad.

{¶ 119} R.C. 149.43(B)(2), which provides various duties and responsibilities for public offices with regard to accessing public records and complying with public records requests, provides as follows:

> To facilitate broader access to public records, a public office
> or the person responsible for public records shall organize and
> maintain public records in a manner that they can be made
> available for inspection or copying in accordance with division
> (B) of this section. A public office also shall have available a

---

[7] As these reports were prepared quarterly and Nelson only provided reports through March of 2021, more than one additional report may have been created between Nelson's June 17, 2021 email and Nelson's responses to Siedle's alternative investments requests. However, as these reports are not in the record, they do not factor into the analysis.

> copy of its current records retention schedule at a location readily available to the public. If a requester makes an ambiguous or overly broad request or has difficulty in making a request for copies or inspection of public records under this section such that the public office or the person responsible for the requested public record cannot reasonably identify what public records are being requested, the public office or the person responsible for the requested public record may deny the request but shall provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's or person's duties.

R.C. 149.43(B)(2). Thus, R.C. 149.43(B)(2) permits a public office to deny a request for public records because the request is ambiguous or overly broad such that the person responsible for the requested public record cannot reasonably identify what public records are being requested. However, when denying a request on this basis, the public office or the person responsible for the requested public record is required to "provide the requester with an opportunity to revise the request by informing the requester of the **manner in which records are maintained** by the public office and **accessed** in the ordinary course of the public office's or person's duties." (Emphasis added.) R.C. 149.43(B)(2). *See State ex rel. ESPN, Inc. v. Ohio State Univ.*, 132 Ohio St.3d 212, 2012-Ohio-2690, ¶ 11; *Zidonis*, 2012-Ohio-4228, at ¶ 33.

{¶ 120} In *Zidonis*, the Supreme Court of Ohio found that the lower court did not err in determining that the public office complied with R.C. 149.43(B)(2) when denying a request for certain complaint files, litigation files, and emails as overbroad. In making this finding, the court pointed to several factors that demonstrated the public office's compliance. First, there was evidence the public office explained at a status conference that the public office "retains, organizes, and accesses its records based on content." *Zidonis* at ¶ 35. Second, the public office provided the requester with "a copy of its records-retention schedule, which defined these files as records of 'staff or student grievances based on equal opportunity and affirmative action regulations' with the '[f]iles arranged alphabetically.' " *Id.* at ¶ 36. Third, the requester's counsel "indicated in the record requests that he understood how the requested e-mails were maintained and accessed." *Id.* at ¶ 37. Fourth, the requester already understood how the public office maintained and accessed certain

records. Fifth, notwithstanding the lack of a viable request, the public office created a program to search for the requested emails and provided such emails to the requester. Finally, the court noted that the requester ignored the public office's multiple invitations to contact its in-house counsel to help the requester refine her overbroad requests.

{¶ 121} STRS argues that it complied with R.C. 149.43(B)(2) because it provided Siedle a copy of its records retention schedule on June 30, 2021. STRS also argues it complied with R.C. 149.43(B)(2) by providing "a link to its 2020 Comprehensive Annual Financial Report on April 15, 2021 * * *, its Records and Information Management [Program] Guidelines on June 30, 2021 * * * , and its Public Records Policy on October 28, 2021." (STRS's Brief at 38.) Initially, it is noted that the "Public Records Policy" that STRS states it provided on October 28, 2021 appears to be the same document identified as STRS's Records and Information Management Program Guidelines ("records guidelines") provided on June 30, 2021. *Compare* STRS's Evidence at 4387, 22854 *with* STRS's Evidence at 5375, 22854.

{¶ 122} STRS's records guidelines contained the following statement of purpose:

> In the course of daily business, STRS Ohio associates create, receive, and maintain numerous records on behalf of STRS Ohio. The purpose of these guidelines is to define the basic requirements and roles and responsibilities of our Records and Information Management program, including the retention and disposition of STRS Ohio records, regardless of media, thereby meeting legal and regulatory requirements, risk mitigation and operational needs.

(STRS's Evidence at 22854.) The records guidelines were designed to "[e]nsure that records and information, regardless of physical or electronic format, are organized in a manner that ensures timely, efficient and accurate retrieval of needed information." (STRS's Evidence at 22854.) Under roles and responsibilities, the records guidelines provided that the general counsel will "[c]reate and maintain an ongoing and active records management program." (STRS's Evidence at 22855.) The records and documentation administration manager was tasked with, in part, acting "as the Custodian of Records for STRS Ohio receiving and responding to public records requests and subpoenas for records, coordinating with the Legal Department on formal requests and formulation of responses and authenticating and certifying copies of records." (STRS's

Evidence at 22855.) Individuals in management of particular departments were required to "[e]nsure **file plan** and Records Retention Schedule are documented, maintained and followed, with guidance from Records & Documentation Administration Manager." (Emphasis added.) (STRS's Evidence at 22856.)

{¶ 123} The records guidelines also contained several definitions. "Classification system" was defined as "[a]n organized structure for arranging or grouping information (records, documents, files, data, etc.) by subject, function, process, activity or other metadata elements." (STRS's Evidence at 22856.) "File plan" was described as follows: "The file plan is a map of the records maintained or used by an area based on their processes, functions and activities. Every record maps back to the STRS Ohio Records Retention Schedule for disposition. **The file plan also lists the locations where the records are maintained using standardized locations**." (Emphasis added.) (STRS's Evidence at 22857.)

{¶ 124} The documents cited by STRS do not establish that STRS complied with its obligations under R.C. 149.43(B)(2) in denying Siedle's records requests as overly broad or ambiguous. First, the records retention schedule described broad categories of records, listed types of records within each category, described the function of groups of categories, listed the number of years categories of records must be maintained, and provided the office of record. While this may be helpful information for a person seeking to make a clear, specific public records request, it does not fully explain how STRS's records were maintained and accessed. *See, e.g., Graham v. Cleveland*, Ct. of Cl. No. 2019-00869PQ, 2019-Ohio-5485, ¶ 10, *adopted*, 2020-Ohio-640 (stating in a special master's report and recommendation adopted by the Court of Claims that evidence demonstrated "how the requested reports are organized, maintained, and retrieved" by the public office responding to the request). Unlike *Zidonis*, in which evidence demonstrated that the records themselves were retained, organized, and accessed by content in addition to being arranged alphabetically, no such information appears in STRS's records retention schedule.

{¶ 125} Second, although the records guidelines stated that there should exist a classification system for arranging information by "subject, function, process, activity **or** other metadata elements," the records guidelines did not explain what particular classification system STRS employed with regard to the requested records. (Emphasis

added.) (STRS's Evidence at 22856.) Unlike in *Zidonis*, in which the public office explained that it organized and accessed its records based on content, STRS points to no such statement in the record in this matter. The records guidelines also indicated that STRS maintained an internal file plan that mapped records maintained or used by the various departments within STRS and listed the locations where the records were maintained. STRS does not argue that it provided this information to Siedle in satisfaction of its obligations under R.C. 149.43(B)(2). Thus, STRS has not demonstrated that the records guidelines informed Siedle of the manner in which records are maintained by STRS and accessed in the ordinary course of the STRS's duties.

{¶ 126} Third, STRS does not explain how its 2020 Comprehensive Annual Financial Report satisfied its obligations under R.C. 149.43(B)(2).[8] Thus, STRS does not explain how the cited documents inform the requester of the manner in which records are (1) maintained by the public office, and (2) accessed in the ordinary course of the public office's or person's duties.

{¶ 127} STRS raises other arguments in support of its position that it did not violate R.C. 149.43(B)(2). First, citing *Zidonis*, STRS argues that its voluntary efforts to identify and provide responsive records despite deficiencies in Siedle's requests satisfy the requirements of R.C. 149.43(B)(2). However, many of the circumstances present in *Zidonis* are not found in this matter. In addition to the differences already discussed, this matter is different in another crucial way. In *Zidonis*, the requester's counsel indicated familiarity with the recordkeeping system employed by the public office and the requester understood how the public office maintained and accessed certain records. Here, Siedle stated that in his June 26, 2021 letter to STRS that he was "unfamiliar with STRS's record-keeping system." (Siedle's Evidence at 19.) Thus, *Zidonis* does not support STRS's arguments here. Regardless, the text of R.C. 149.43(B)(2) is clear. Attempting to comply with an overly broad or ambiguous request by providing some records is *not* the same as informing the requester

---

[8] STRS states that it provided a link to its 2020 Comprehensive Annual Financial Report in Nelson's April 15, 2021 email to Siedle's counsel. *See* STRS's Brief at 38, citing STRS's Evidence at 2823. However, the copy of this record provided to the court in STRS's evidence does not appear to contain a functional link. Nor does STRS point to the location of this report elsewhere in its submitted evidence.

of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's duties.

{¶ 128} Next, STRS argues it did not violate R.C. 149.43(B)(2) because "in at least fifteen emails, STRS invited [Siedle] to correct his request and resend it to STRS so that STRS could respond in kind." (STRS's Brief at 39.) However, merely offering an opportunity to revise a request does not satisfy the requirements in the plain text of R.C. 149.43(B)(2). Offering an opportunity to correct a request without providing the information that is both required by statute and necessary to formulate a proper request is little opportunity, if any at all.

{¶ 129} In sum, STRS has not demonstrated that, after denying Siedle's requests as ambiguous or overly broad, it provided Siedle an opportunity to revise his requests by informing him of the manner in which records are maintained by STRS and accessed in the ordinary course of the STRS's duties. As a result, the magistrate finds STRS violated the clear command of R.C. 149.43(B)(2).

{¶ 130} This finding, however, is not the end of the analysis. Citing the Supreme Court of Ohio's decision in *ESPN*, STRS argues that even if it violated R.C. 149.43(B)(2), Siedle failed to request that STRS be ordered to inform him of the way in which STRS maintains and accesses its records. As a result, STRS argues Siedle is not entitled to relief other than a finding of violation.

{¶ 131} In *ESPN*, the court found that the Ohio State University ("Ohio State") violated R.C. 149.43(B)(2) because it denied ESPN's public records requests as overly broad without providing the required information regarding the manner in which Ohio State maintained and accessed its records. Despite finding that Ohio State violated R.C. 149.43(B)(2), the court held that ESPN did not specifically seek relief to remedy these violations under a former version of R.C. 149.43(C)(1). The court found that although ESPN alleged Ohio State failed to comply with R.C. 149.43(B)(2) in its complaint and briefs, ESPN did not ask that Ohio State be ordered to inform it of the way Ohio State maintained its records so that ESPN could revise its requests. Rather, "ESPN limited its request for relief to a writ of mandamus to compel Ohio State to provide access to the requested records." *ESPN*, 2012-Ohio-2690, ¶ 12.

{¶ 132} With regard to other relief available to ESPN, the court noted ESPN did not seek statutory damages for Ohio State's failure to comply with R.C. 149.43(B)(2). Furthermore, the court enigmatically stated that "insofar as ESPN seeks attorney fees, these violations comprise only a small portion of its true claims here." *Id*. at ¶ 13. Finally, the Court noted ESPN did not suggest that any claimed failure by Ohio State to comply with R.C. 149.43(B)(2) "resulted in an unreasonable delay in Ohio State's ultimately complying with the requests—except for the redacted and withheld portions of the responsive records that ESPN contests." *Id*. at ¶ 14. The court held that "[b]ased on the foregoing, under these particular facts, although Ohio State committed per se violations of R.C. 149.43(B)(2) * * * in initially responding to ESPN's records requests, ESPN is not entitled to relief for these violations beyond that finding." *Id*. at ¶ 15.

{¶ 133} Here, as in *ESPN*, Siedle did not specifically ask that STRS be ordered to inform it of the way it maintained and accessed its records as required under R.C. 149.43(B)(2). Instead, Siedle sought a writ of mandamus to compel STRS to provide him with the requested records. Siedle also sought "statutory damages **for each request** as provided under R.C. 149.43(C)" and "court costs and attorney's fees pursuant to R.C. 149.43(C)." (Emphasis added.) (Compl. at 8.) Therefore, although STRS committed a violation of R.C. 149.43(B)(2) by failing to inform Siedle of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's duties, Siedle is not entitled to a writ of mandamus ordering STRS to provide such information. *See ESPN* at ¶ 15.

## D. Conclusion

{¶ 134} The Public Records Act "contemplates that the requester and the public-records custodian cooperate in fulfilling a request." *State ex rel. Morgan v. Strickland*, 121 Ohio St.3d 600, 2009-Ohio-1901, ¶ 18. *See State ex rel. Dissell v. Cleveland*, 8th Dist. No. 110425, 2021-Ohio-2937, ¶ 33. Neither party in this matter has lived up to this principle of cooperation in their responses to one another regarding the public records requests at issue.

{¶ 135} In conclusion, the magistrate finds Siedle has established a clear legal right to the production of public records sought in the first investment managers request and the first Panda Investments request. STRS was under a clear legal duty to comply with these

public records requests. Accordingly, it is the decision and recommendation of the magistrate that this court issue a writ of mandamus ordering STRS to comply with Siedle's first investment managers request in the February 19, 2021 letter and first Panda Investments request in the June 26, 2021 letter. The magistrate recommends that such order specifically permit STRS to withhold or redact records that are not subject to disclosure under exceptions to the Public Records Act. *See State ex rel. McCarley v. Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-337, 2022-Ohio-3397, ¶ 13. Furthermore, should the court adopt the above recommendations, the magistrate recommends this matter be returned to the magistrate for briefing and submission of any evidence regarding Siedle's requests for awards of statutory damages, court costs, and attorney fees.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.